FILED
JAMES J. VILT JR., CLERK
U.S. DISTRICT COURT
W/D OF KENTUCKY

Date:      Aug 23, 2022

## Plea Agreement Addendum – Kelly Goodlett Factual Basis

- In late 2019 and early 2020, Det. Kelly Goodlett worked in the Place-Based Investigations Unit (PBI) at the Louisville Metro Police Department (LMPD).  In early 2020, PBI investigated a crime hot spot centered on the 2400 block of Elliott Avenue in Louisville's West End neighborhood.  One of the primary targets of the investigation was J.G.  During the investigation, Det. Goodlett frequently partnered with LMPD Det. Joshua Jaynes, who was the lead detective in the unit.  Det. Goodlett's immediate supervisor was LMPD Sergeant Kyle Meany.

- The primary focus of PBI's investigation was drug dealing by J.G. and his associates that took place in and around the 2400 block of Elliott Avenue.  PBI also investigated whether there was evidence of J.G.'s narcotics trafficking at other properties, such as the home of a woman with whom he shared a child, located on Cathe Dykstra Way, and at Breonna Taylor's apartment, located at 3003 Springfield Drive, Apt. 4.  On March 12, 2020, Det. Goodlett went with Det. Jaynes as he swore out warrant affidavits to search five properties: three properties on Elliott Avenue, a nearby location on Muhammad Ali Blvd, and Taylor's apartment on Springfield Drive.

- Det. Jaynes was the primary drafter of the Springfield Drive warrant affidavit, but Det. Goodlett fact-checked the affidavit and added some information to it.  The most important information in the warrant affidavit that linked J.G.'s drug trafficking to 3003 Springfield Drive was the claim that Jaynes had verified from a Postal Inspector that J.G. was receiving packages at that address.  As explained below, Det. Goodlett and Det. Jaynes both knew this claim was false.

- On one occasion, on January 16, 2020, Det. Jaynes and Det. Goodlett had seen J.G. pick up a package at Breonna Taylor's apartment.  They did not have any evidence of what was in the package, but based on what they knew of J.G., they suspected that he was picking up drugs or drug proceeds.  The detectives therefore wanted to get a warrant for Taylor's home, in the hopes that they would find drugs, currency, or evidence of drug trafficking there.  The detectives, knowing that they needed actual evidence, rather than just a gut feeling, to get a warrant, attempted to find evidence supporting this gut belief.  They were unable to find any other evidence that J.G. received packages at Taylor's apartment or any evidence that J.G. even went to Taylor's apartment after January 2020.

- Specifically, Det. Jaynes advised Det. Goodlett that he asked Sgt. J.M. to use his contacts at the U.S. Postal Inspection Service (USPIS) to investigate whether J.G. was receiving packages at Taylor's apartment.  About a week later, Det. Goodlett followed up with Det. Jaynes to ask if Sgt. J.M. had responded.  Det. Jaynes told her that Sgt. J.M. had found that "there's nothing there," or similar words to like effect (meaning there was no evidence of J.G. getting mail), and that Taylor's address was "not flagged" by Postal for receiving any suspicious packages.  Det. Jaynes expressed his disappointment to Det. Goodlett.  Det. Goodlett knew from her training and experience that this information cut against their assumption that J.G. kept drugs or drug proceeds at Taylor's home.  Det. Goodlett knew

1

that, because the claim in the Springfield Drive warrant affidavit that J.G. was receiving packages at Taylor's home was crucial to showing there was probable cause, officers had a duty to disclose to the court that they had received the contrary information from Sgt. J.M. Det. Goodlett knew that Det. Jaynes, who was better trained and far more experienced than she was, also knew that the affidavit had to include the negative information about packages.

- Around March 10 or 11, 2020, Det. Jaynes gave Det. Goodlett a draft of the Springfield Drive warrant affidavit for her to review. Det. Goodlett saw that Det. Jaynes had added a paragraph claiming falsely that Det. Jaynes had "verified" from a Postal Inspector that J.G. was receiving packages at Taylor's address. Det. Goodlett knew from her conversation with Det. Jaynes that Sgt. J.M. had actually told Det. Jaynes the opposite. She also knew from conversations with Det. Jaynes that Det. Jaynes had never even talked to a Postal Inspector. As a result, Det. Goodlett recognized at the time that the claim Det. Jaynes made about packages in the Springfield Drive affidavit was false. Det. Goodlett also knew, based on her conversations with Det. Jaynes, that he knew it was false, too. Even though Det. Goodlett knew the claim about packages in the affidavit was false, she failed to change the statement or to object to it. Det. Goodlett had been ostracized early in her career for attempting to report a fellow officer's use of excessive force, so she decided not to call Det. Jaynes out on this lie, as Det. Jaynes was the lead detective on the case.

- Before Det. Jaynes finalized the Springfield Drive warrant affidavit, Det. Goodlett told Det. Jaynes that she was concerned that the draft affidavit did not have enough current information to connect Taylor's apartment to J.G.'s drug dealing. Specifically, she knew that information in the affidavit about J.G. making "frequent trips" to Taylor's home was from January 2020, at least 6 weeks before the warrant would be executed. To make the warrant appear fresher, Det. Goodlett added a paragraph stating that Det. Jaynes had "verified" from law enforcement databases that J.G. used Taylor's apartment as "his current home address." Det. Goodlett and Det. Jaynes both knew at the time that this was misleading because J.G. did not, in fact, live at Taylor's apartment. Det. Goodlett knew that J.G. had not been seen at Taylor's apartment since January 2020. Det. Goodlett also knew that Det. Jaynes prepared another affidavit, to get a warrant to search a different apartment on Cathe Dykstra Way, in which he stated that he "believes that [the address on] Cathe Dykstra is the main residence for [J.G.]." Additionally, she knew that Det. Jaynes prepared another affidavit to get a warrant to search a home on Elliott Avenue, and in that affidavit he stated that J.G. "has [the address on] Elliott Avenue as his registered address with the DMV."

  Det. Goodlett showed the new paragraph to Det. Jaynes, and he agreed to include it in the affidavit for the Springfield Drive warrant.

- Det. Goodlett also saw that Det. Jaynes had included in the affidavit a paragraph seeking permission to enter Taylor's apartment without knocking (a "no-knock" provision). That paragraph claimed that officers needed a no-knock entry because "these drug traffickers have a history of attempting to destroy evidence, have cameras on the location that compromise Detectives once an approach to the dwelling is made, and a have [sic] history

of fleeing from law enforcement." Det. Goodlett knew that this claim was false as it related to Taylor because the detectives had absolutely no reason to believe that Taylor was a drug trafficker, or that she had ever tried to destroy evidence or flee from law enforcement, or that there were any cameras around her property. Det. Goodlett knew through conversations with Det. Jaynes that he too knew that none of the statements in the no-knock paragraph related to Taylor. Det. Goodlett knew from conversations with Det. Jaynes and Sgt. Kyle Meany that they expected Taylor to be home alone. Because Det. Goodlett was attending a funeral, she did not attend a meeting held on March 5, 2020, between LMPD SWAT officers and PBI officers, including Det. Jaynes and Sgt. Meany. Det. Goodlett did not know why Det. Jaynes and Sgt. Meany included a paragraph asking for a no-knock entry at Taylor's apartment. Based on the facts that Det. Goodlett knew about Taylor and her apartment, she did not believe that a no-knock warrant was necessary. Det. Goodlett did not ever hear anyone from SWAT instruct Det. Jaynes or anyone else to seek a no-knock warrant at Taylor's home.

- On March 12, 2020, Det. Goodlett and Det. Jaynes took five warrants to Judge Mary Shaw. Det. Jaynes chose which judge to go to. Det. Goodlett had previously heard Det. Jaynes make comments suggesting that he believed that Judge Shaw would not closely scrutinize his warrants.

- On the evening of March 12, 2020, Det. Goodlett and other PBI officers met before the briefing for officers executing the search warrants. At that meeting, she learned for the first time that Sgt. Meany wanted officers to knock and announce their presence at Taylor's residence, even though the warrant was sworn out as a no-knock. Det. Goodlett observed that Meany looked very nervous during this meeting.

- After the shooting, criminal investigators with LMPD's Public Integrity Unit asked Det. Jaynes and Det. Goodlett to submit an "investigative letter" that documented the information they found in their investigation. By this time, Det. Goodlett and Det. Jaynes knew that Breonna Taylor had been killed at Springfield Drive, and that the Springfield Drive search warrant affidavit that Det. Jaynes wrote and Det. Goodlett reviewed would be closely scrutinized. Det. Jaynes sent Det. Goodlett a draft of the investigative letter on April 11, 2020. Det. Goodlett knew that the letter contained false information, including repetition of the claim that Sgt. J.M. had verified through Postal Inspectors that J.G. received packages at Taylor's apartment. Det. Goodlett knew that Sgt. J.M. told Det. Jaynes there was no evidence of J.G. receiving packages at Taylor's apartment. **(**Det. Goodlett would learn far later that, at the time, it was not even possible for Sgt. J.M. to get from postal inspectors the exact sort of package information Det. Jaynes mentioned in his affidavit). But Det. Jaynes had already included the false claim in the warrant affidavit, so Det. Jaynes and Det. Goodlett reasserted it in the investigative letter. Det. Jaynes never mentioned to Det. Goodlett that, in the prior few days, he had talked to Sgt. J.M. and two Shively Police Department officers – all of whom had told him, again, that there was no evidence of J.G. receiving packages at Taylor's apartment.

- The investigative letter also claimed that detectives had verified from databases that J.G. used Springfield Drive as his "residence," which was even more false than the similar

3

claim made in the affidavit that J.G. used Springfield Drive as his "home address." Det. Goodlett and Det. Jaynes both knew that this information was false. In fact, Det. Goodlett and Det. Jaynes both knew that J.G. did not live at Taylor's apartment. Det. Goodlett asked Det. Jaynes if he thought it was a good idea for her to co-sign the investigative letter, given all the work she had put into it. Det. Jaynes encouraged her to sign the letter along with him. At the time she signed the letter, Det. Goodlett was hoping that the letter would clear both Det. Jaynes and her of suspicion of wrongdoing.

- Det. Goodlett and Det. Jaynes submitted the investigative letter on May 1, 2020. The detectives worked on the letter jointly, submitted it jointly, and both intended to take responsibility for everything in it.

- On May 16, 2020, media outlets reported publicly that the Postal Inspector had announced that the claim in the affidavit about J.G. receiving packages at Taylor's apartment was false. Det. Goodlett realized immediately that she and Det. Jaynes were in trouble. That day, Det. Jaynes texted Det. Goodlett that he was "stressed" about the Postal Inspector's statement. The next day, May 17, Det. Jaynes texted Det. Goodlett that a criminal investigator wanted to meet with him the following day. Det. Jaynes then asked Det. Goodlett to meet with him in Det. Jaynes's garage that evening. At the garage meeting, Det. Jaynes told Det. Goodlett that they needed to get on the same page because if he went down, so to speak, for the Springfield Drive warrant, she would go down too. Det. Jaynes made clear to Det. Goodlett that he wanted her to repeat his false story. Det. Jaynes told Det. Goodlett, repeatedly, that "[Sgt. J.M.] told us [J.G.] was getting packages there," and Det. Jaynes repeatedly asked Det. Goodlett, in a suggestive, badgering way, "that's what you heard, right?" Det. Goodlett knew that she never heard Sgt. J.M. say any such thing – and she knew from her conversation with Det. Jaynes in January 2020 that Det. Jaynes also knew the claim to be false. Det. Goodlett understood that these statements were to be the cover story that she and Det. Jaynes would tell. Det. Jaynes kept pressuring Det. Goodlett to go along with his false story, and she eventually buckled and agreed to repeat it to others.

- After the garage meeting, Det. Jaynes falsely told criminal investigators from LMPD's Public Integrity Unit that Sgt. J.M. "nonchalantly" said "your guy just gets Amazon or mail packages" at Taylor's apartment. When Det. Goodlett learned about Det. Jaynes's false statement some time later, she was not surprised because it is consistent with what Jaynes told her he was going to do (and what he badgered her to do) during their garage meeting. Det. Goodlett also later repeated the false claim about Sgt. J.M. in an interview with the Kentucky Attorney General's Office (KOAG), knowing it was false. She falsely told KOAG that "Sergeant [J.M.] in passing was like sorry about the confusion. I misunderstood. But I verified he was getting packages there."

- Prior to the warrant being sworn out in March, PBI officers had done surveillance at Taylor's apartment. Det. Goodlett remembers clearly that Sgt. Meany was present on January 16, 2020, when she and Det. Jaynes were conducting surveillance and saw J.G. pick up a package from Taylor's apartment. On that day, Sgt. Meany was sharing a car with Det. W.B. Sgt. Meany and Det. W.B. were in the lead car that tried to follow J.G. when he drove away from Taylor's apartment.

4

- In the two days before the warrants were sworn out, Det. Goodlett and Det. Jaynes conducted surveillance to get "fresh" probable cause on the properties on Elliott Avenue and Muhammad Ali Blvd. Det. Goodlett knew that Sgt. Meany conducted surveillance at Taylor's apartment on March 11, 2020, in part to try to find fresh information to add to the Springfield Drive warrant affidavit, but Sgt. Meany reported that he did not find anything.

- Det. Goodlett did not know that, while Sgt. Meany was conducting surveillance on March 11, 2020, he saw K.W.'s car parked near Taylor's apartment and then saw a "workup" showing that K.W. had a relationship with Taylor and had a concealed carry license. The fresh information about K.W. being at Taylor's home the day before the warrant was to be sworn out would have undermined the basis to search Taylor's apartment because it called into question the existence of an ongoing relationship between Taylor and J.G., which was a leading basis for searching Taylor's apartment in the first place. It also demonstrated a different, potentially longstanding relationship between Taylor and another man, who also had an association with her address, likewise undermining the basis to search Taylor's apartment. It would be important to share the information about K.W. with officers who were executing the warrant for officer-safety reasons, among other reasons. Det. Goodlett would have "thrown a fit" if she had known that information existed and that it was neither included in the affidavit nor provided to officers executing the warrant. It is further Det. Goodlett's belief that the existence of a potentially-armed male at the Taylor residence would have resulted in a different, more severe score on the LMPD search warrant risk matrix system. In short, Det. Goodlett knew from her training, experience, and the typical practices of the LMPD that there is really no circumstance under which the potential presence of K.W. at Taylor's residence, plus his background with Taylor and the fact that he had a permit to carry a concealed weapon, could justifiably have been withheld from fellow officers or the court.

- Sgt. Meany was a hands-on supervisor. He frequently went out in the field with the PBI detectives, he kept notes nearly every day to document PBI's investigative activities, and he knew nearly everything that the detectives were doing through group conversations that the detectives had in their shared office space.

- In sum, Det. Goodlett and Det. Jaynes, both of whom were acting under color of law, agreed to press forward with a search warrant for Ms. Taylor's home despite knowing that they lacked probable cause. They agreed to do this by falsifying the affidavit used to get the warrant. Det. Goodlett and Det. Jaynes thus conspired to willfully violate Ms. Taylor's right to be free from unreasonable searches. When they conspired to violate Ms. Taylor's Fourth Amendment rights, they knew that the warrant would be executed, at night, by officers with firearms, and that it was foreseeable that a person in the home could be injured or killed.

- Det. Goodlett and Det. Jaynes also conspired, after the shooting, to cover up the fact that they had falsified the search warrant for Ms. Taylor's home. Specifically, they agreed to falsify a document (the investigative letter) and to engage in misleading conduct toward

investigators in order to hinder, delay or prevent the communication to federal officials of truthful information about the falsification of the warrant, which was a federal offense.

_____  _____
Kelly Goodlett    *Kelly Goodlett*    Date
Defendant